## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **DOMUS BWW FUNDING, LLC,** *et al.*, | |
| *Plaintiffs*, | |
| v. | **Case No. 2:23-cv-00094-JDW** |
| **ARCH INSURANCE COMPANY,** *et al.*, | |
| *Defendants*. | |

### <u>MEMORANDUM</u>

When an insurance policy provides protection against liability from an underlying lawsuit, a judge must compare the allegations in the lawsuit to the scope of the policy. In this case, that means I must compare the terms of the policy that Arch Insurance Company sold to Versa Capital Management, LLC. Doing so at this stage of the proceedings does not present a factual dispute. Instead, it demonstrates that at least some of the claims in an underlying lawsuit arose from the performance of "Asset Management Services," to use the policy's language. Because there's no factual dispute about that, Arch must reimburse Domus BWW Funding, LLC and 1801 Admin LLC (which are both Versa affiliates) for costs that they incurred defending an underlying lawsuit. There's also no factual dispute that the statute of limitations bars those companies' bad faith claims against Arch. I will therefore grant summary judgment to each side, at least in part.

## I.   BACKGROUND

### A.   Factual Background

#### 1.   The Domus entities

1801 Admin LLC ("1801") is an investment advisor that provides investment advisory services to private investment funds, including Versa Capital Fund II, L.P. ("Fund II"). 1801 is also part of the private equity group Versa Capital Management, LLC ("Versa"). Domus BWW Funding, LLC ("Domus BWW") is a special purpose lending vehicle that Fund II owns and that 1801 managed from 2013 to 2014. (I will refer in this Memorandum to 1801 and Domus BWW collectively as "Domus.") Fund II formed Domus BWW to facilitate the acquisition of BridgeStreet Worldwide, Inc. ("BWW"). BWW was the corporate holding company of BridgeStreet Corporate Housing, LLC, a company operating in the corporate housing sector.

#### 2.   The BridgeStreet takedown

On March 1, 2012, BridgeStreet entered a lease of the residential portion of a property that 47 East 34th Street (NY), L.P. ("47 East") owned. BWW also executed a guaranty of that lease for the benefit of 47 East. On February 28, 2014, BridgeStreet and 47 East entered an Addendum continuing the lease on a month-to-month basis.

In 2014, the New York Attorney General began an investigation into allegations that BridgeStreet was using the residential portion of its building as an extended stay hotel, rendering 47 East ineligible for real estate tax abatements it had been receiving. On February 18, 2015, 47 East entered an Assurance of Discontinuation with the

Attorney General and repaid over $4 million in abated taxes and investigation costs. On May 28, 2015, 47 East demanded indemnification from BridgeStreet and BWW, which it alleged had caused the housing use violations. 47 East sued BridgeStreet in New York state court ("the *Bridgestreet* Action") and won.

In the time between BridgeStreet's and BWW's execution of the lease and guaranty and their loss in the *BridgeStreet* Action, Domus gained control of BWW. BWW was carrying a high level of debt, struggling with liquidity, and regularly stretching rent payments on its leases. 1801 formed Domus BWW to execute its investment strategy of purchasing a struggling company's outstanding debt, extending additional loans to that company, and later collateralizing the debt and foreclosing on the company. Fund II, via Domus, purchased BWW's existing debt, on which BWW would eventually default. When BWW defaulted, Domus negotiated a forbearance agreement and provided BWW with additional funding. In November 2013, BWW notified Domus that it could not meet its obligations under the forbearance agreement. At Domus's suggestion, BWW's board agreed to a consensual foreclosure pursuant to which Domus acquired BridgeStreet. BWW then dissolved. After acquiring BridgeStreet, Domus continued to manage Fund II's investment in the company on a day-to-day basis.

### 3.    The insurance policies

Arch sold Alternative Asset Management and Private Equity Management & Professional Liability Insurance Policy No. AAP 9300006-04 for policy period October 30,

3

2017, to October 30, 2018, to Versa (the "Arch Policy"). The Arch Policy provides $5 million of coverage in excess of a $500,000 retention. QBE Insurance Company sold Versa an excess policy that follows form to the Arch Policy and provides an additional $5 million of coverage in excess of the Arch Policy's $5 million limit. (the "QBE Policy"). XL Specialty Insurance Company and Aspen American Insurance Company sold Versa additional excess insurance policies that follow form to the Arch Policy.

The Arch Policy provides coverage for loss on behalf of an insured organization, which includes Domus (and Fund II). It includes provisions requiring Arch to advance fees and expenses incurred in the defense or appeal of a claim brought due to any "actual or alleged act, omission, error, neglect, statement, misstatement, misleading statement, breach of duty or the aiding or abetting of any breach of any duty committed or attempted, or allegedly committed or attempted, by an Insured," "by an Insured in the performance of, or failure to perform, Investment Activities," or "by an Insured Entity arising out of, relating to or in connection with any past, present or future investment by any Insured Entity in a Portfolio Company (or prospective or former Portfolio Company)." (ECF No. 1-1 at 74–75.)

The Arch Policy excludes coverage for any "Loss ... in connection with any Claim against an Insured Organization arising from, based upon, or attributable to any contract or agreement." (*Id.* at 50–52 (emphases omitted) (the "Contract Exclusion").) However, the Contract Exclusion does not apply to Loss "resulting from . . . Asset

Management Services [or] any contract to purchase, invest in, or lend money to a Portfolio Company or potential Portfolio Company." (*Id.* at 52 (emphases omitted).)

The Arch policy defines Asset Management Services, in relevant part, as any statement, act, omission, service, or advice for (a) investment in or management of a Portfolio Company; (b) a Fund or Portfolio Company concerning any investment or transaction concerning any equity, debt, or loan (or other investment vehicle); (c) recapitalization of a Portfolio Company; (d) advice to a Portfolio Company arising from the extending or refusal to extend credit; or (e) any repurchase, redemption, purchase or sale of securities or other interests in a Portfolio Company. (ECF No. 1-1 at 68–69.) The Arch Policy defines a Fund, in relevant part, as any pooled investment vehicle under Management Control:

1. Listed as a "Fund" in a written endorsement issued by the Insurer;

2. Sponsored or created by an Insured Organization during the Policy Period; or

3. Sponsored or created by an Insured Organization that is a co-investment fund or parallel fund to any Fund described in 1 or 2 above.

(*Id.* at 43–44.) It defines a Portfolio Company as any:

1. Entity while a Fund directly, or indirectly through one or more Investment Holding Companies, maintains an ownership interest in such entity's debt or equity securities,

2. Co-Investment Vehicle or subsidiary of such entity; or

3. Acquisition Vehicle if, after the effective time of the transaction for which such Acquisition Vehicle was specifically created, such entity is a surviving entity, and any subsidiary of such entity.

(*Id.* at 46–47 (emphases omitted).)

### 4. The *47 East* Action

47 East proved unable to collect from BridgeStreet the judgment it won in the

*BridgeStreet* Action. Fearing such a possibility and having learned that BridgeStreet had

transferred all its assets to Domus and that BWW had dissolved, 47 East filed a separate

lawsuit on July 3, 2018, against BWW and Domus (the "*47 East* Action") to recover the

amounts that it alleged BridgeStreet owed 47 East. 47 East asserted claims for

enforcement of the guaranty, breach of contract, unlawful assignment, fraudulent

conveyance, tortious interference, fraudulent concealment, and fraudulent

misrepresentation. 47 East also sought a judgment piercing BWW's corporate veil to

reach Versa and Domus. After lengthy litigation in New York's state courts, including

multiple rounds of summary judgment, appeals, and reversals, 47 East sold its remaining

claims against Domus to a third party. The Parties settled the case for $200,000.

### 5. Domus's insurance claim

Domus noticed a claim to Arch, QBE, XL, and Aspen for defense costs on July 25,

2018. In October 2018, Arch hired BatesCarey LLP to conduct a preliminary coverage

review and draft a coverage position letter. BatesCarey drafted a letter for Arch that

would have acknowledged coverage for defense costs in the *47 East* Action. But Arch

never sent that letter. Instead, it denied coverage in a letter dated December 30, 2019. It

based its denial on the Contract Exclusion. (*See* ECF No. 97-44 at 7.) In its letter, Arch

invited Domus to contact Arch if it had questions or disagreed with the coverage
analysis.

Domus challenged Arch's coverage analysis. Arch responded by letter dated June
22, 2021. That letter maintains Arch's position that the Contract Exclusion barred
coverage for the *47 East* Action. (*See* ECF No. 97-45 at 2–9.) Again, Arch concluded the
letter by offering to consider any counterarguments that Domus might offer.

On April 30, 2022, Domus again pushed back on Arch's coverage denial. Arch
again responded. Arch again relied on the Contract Exclusion as a basis to deny
coverage. (*See* ECF No. 97-72.) Arch again noted its willingness to engage in further
dialog if Domus had additional facts to offer.

### 6.    Domus's defense costs

During the *47 East* Action, Domus accrued significant defense costs that the
Insurers refused to advance. After the trial court in the *47 East* Action granted summary
judgment against Domus, Domus appealed. However, it did not have sufficient capital
or credit to secure a bond that would stay collection of the judgment while that appeal
was pending. Instead, 1801 and Domus BWW declared bankruptcy.

Domus's bankruptcy proceedings are ongoing. As of March 4, 2024, Domus had
incurred $5,056,849.31 in defense costs, including $1,185,700.19 for proceedings in the
Bankruptcy Court and $3,871,149.12 for defense of the *47 East* Action. (ECF No. 97-290
at ¶ 76.)

**B.     Procedural History**

Domus initiated this suit in Bankruptcy Court against Arch, QBE, XL, and Aspen on September 27, 2022. The Complaint asserted claims for breach of contract and statutory and common law bad faith against Arch and sought a declaratory judgment that the excess insurers had a duty to advance defense costs. On January 5, 2023, I withdrew the reference.

On June 28, 2023, Domus moved for partial summary judgment on the duty to advance defense costs. I denied the Motion in an Order dated December 7, 2023. In my decision, I concluded that the Policy's Contract Exclusion barred coverage and that Domus had not demonstrated that an exception to that exclusion applied. Domus sought reconsideration of that Order, which I denied.

During the pendency of the case, Domus and 1801 voluntarily dismissed their claims against Aspen Insurance. The remaining excess insurers later moved to dismiss the claims against them for lack of subject matter jurisdiction on the theory that the damages in this case could not exceed the Arch Policy. I granted that motion with respect to XL and denied it with respect to QBE. After discovery, Arch and QBE moved for summary judgment, and Domus filed a motion for partial summary judgment. The summary judgment motions are now ripe.

While those motions were pending, Domus filed a motion seeking sanctions. I held a hearing and directed some follow-up. On August 12, 2024, I granted the motion

8

with respect to electronic materials that Arch lost during discovery and denied it

otherwise, but I also gave Domus leave to take some additional discovery. The Parties

have sent me competing proposals for that additional discovery, but none of it focuses

on the issues that I rule on in this Memorandum.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a judge to

enter, summary judgment "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986) (quotations omitted).

In ruling on a summary judgment motion, a judge must "view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the [summary

judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

However, "[t]he non-moving party may not merely deny the allegations in the moving

party's pleadings; instead he must show where in the record there exists a genuine

dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir.

2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)–(B). When the moving party

would bear the burden of proof at trial, it must "show that it has produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 237 (3d Cir. 2007) (citations omitted). In that instance, summary judgment is only appropriate if "a reasonable juror would be **compelled** to find [the moving party's] way on the facts needed to rule in its favor on the law." *Id.* at 238 (emphasis added). "[D]oubts as to the sufficiency of the movant's proof" are sufficient to defeat summary judgment. *Id.*

The filing of cross-motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* (quotation omitted). "When confronted with cross-motions for summary judgment 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352, 353 n.1 (E.D. Pa. 2004), *aff'd*, 435 F.3d 431 (3d Cir. 2006).

## III.   DISCUSSION

### A.   Coverage Disputes

Domus has three coverage disputes that I can rule on at this stage: (1) whether an exception to the Contract Exclusion proximately caused Domus's Loss in the *47 East*

Action and thus triggered Arch's duty to advance defense costs; (2) whether Domus can recover expenses it incurred in affirmative litigation it alleges ran parallel to the *47 East Action*; and (3) whether Domus has a viable claim against QBE for QBE's excess policy.

### 1.    Coverage for the *47 East* Action

The Arch Policy states that the insurer shall not pay loss in connection with any claim arising from, based upon, or attributable to any contract or agreement. In Pennsylvania, this means any loss with a "but for" causal connection to a contract or agreement. I held in my Order dated December 7, 2023, that Arch demonstrated such a causal relationship. However, the Arch Policy further provides that the Contract Exclusion shall not apply to Loss resulting from, among other things, Asset Management Services or loans to a Portfolio Company. As Judge Surrick has noted, "[t]he Supreme Court of Pennsylvania has interpreted the words 'resulting from' in an insurance contract as meaning proximate causation." *Cher-D, Inc. v. Great Am. All. Ins. Co.*, No. 05-5936, 2009 WL 943530, at *6 (E.D. Pa. Apr. 7, 2009); *see also Greenwood Racing Inc. v. Am. Guar. & Liabi. Ins. Co.*, 569 F. Supp.3d 243, 250 (E.D. Pa. 2021) (Pappert, J.). I agree. Thus, to demonstrate that the exception to the exclusion applies, Domus must demonstrate that an excepted act was a substantial, *i.e.*, proximate, cause of its Loss.

Under Pennsylvania law, judges determine whether certain acts were a "substantial cause" of resulting loss by considering:

> (a) the number of factors other than the actor's conduct that contributed to producing the harm and the extent of their contribution; (b) whether the actor's

conduct created a force or series of forces that were in continuous and active operation up to the time of the harm, or created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (c) the lapse of time between the actor's conduct and the harm.

*Heeter v. Honeywell Int'l, Inc.*, 195 F. Supp. 3d 753, 759 (E.D. Pa. 2016), *aff'd sub nom.*

*Heeter v. Honeywell Int'l Inc*, 706 F. App'x 63 (3d Cir. 2017) (citing *Vattimo v. Lower*

*Bucks Hosp., Inc.*, 465 A.2d 1231, 1237 (1983)); *see also* Restatement (Second) of Torts §

433 (Am. L. Inst. 1965)).

As the insured party invoking an exclusion to the exception, Domus has the initial burden to demonstrate by a preponderance of the evidence that a given action within the exclusion's scope was a proximate cause of the Loss. *See Consol. Rail Corp. v. ACE Prop. & Cas. Ins. Co.*, 182 A.3d 1011, 1027 (Pa. Super. Ct. 2018). Domus need not exclude every possible alternative cause of its injury. *See Rost v. Ford Motor Co.*, 151 A.3d 1032, 1051 (Pa. 2016). Instead, once Domus has made a *prima facie* showing that its provision of Asset Management Services or a loan to a Portfolio Company was a substantial factor in bringing about its Loss, the burden shifts to Arch to prove that "the alternative cause would have produced the injury independently." *In re Asousa Partnership*, No. 01-12295DWS, 2005 WL 775429, at *6 (Bankr. E.D. Pa. Feb. 2, 2005) (citing *Hamil v. Bashline*, 392 A.2d 1280, 1284-85, (Pa. 1978)); *Watkins v. Hosp. of the Univ. of Penn.*, 737 A.2d 263, 267 (Pa. Super. 1999).

### a.     Domus's showing

Domus has satisfied its initial burden by showing that the *47 East* Action arose

from Domus's management of BWW. There is no dispute that Fund II is a Fund (the Arch

Policy defines it as such) and that BWW is a Portfolio Company within the Policy's reach

because, via Domus, it had an indirect ownership in BWW's debt. 47 East's initial

Complaint in the *47 East* Action defined the scope of that claim and includes the

following key assertions:

- Claims against BWW for breach of its guaranty of BridgeStreet's lease and

    against Versa and Domus as successors-in-interest to BWW;

- Allegations that Versa and Domus "improperly stripped BWW of all assets

    through a series of insider transactions and fraudulent transfers [and]

    orchestrate[d] a rigged consensual foreclosure on BWW's assets and

    BridgeStreet[] at less than fair value" (ECF No. 97-60 at ¶ 5);

- Claims against BWW, Versa, Domus, and their Officers and Directors for "(i)

    breach of contract in connection with the Guaranty; (ii) fraudulent

    concealment; ... (iii) tortious interference with the Guaranty; (iv) fraudulent

    transfers of all or substantially all the assets of BWW to Versa and Domus

    ... at less than fair market value; and (v) assignment of BWW's assets for

    the benefit of creditors and dissolution of the company" (*id.* at ¶ 9); and

13

- Allegations that Versa and Domus purchased BWW's outstanding debt and then forced BWW into foreclosure so that they could purchase BWW and continue to manage BWW until its breach of the guaranty.

When I consider the Complaint from the *47 East* Action, the *Heeter* factors demonstrate that Domus's strategy for acquiring and managing BWW was a substantial cause of Domus's Loss *First*, the only factor other than Domus's investment strategy that contributed to the *47 East* Action was the subsequent breach of the BridgeStreet lease and BWW guaranty. While 47 East brought various causes of action, Domus's investment strategy was the sole cause of most counts in 47 East's Complaint. *Second*, Domus's ongoing financial management of BWW was a constant until the time of the Loss. In fact, 47 East's Complaint states "[f]rom and after March 2014, Versa and Domus exercised … complete domination and control over BWW and its performance under the Guaranty." (ECF No. 97-60 at ¶ 50.) Domus's Asset Management Services were not "a situation harmless unless acted upon by other forces for which [it] is not responsible;" they gave rise to 47 East's claims. *Heeter* 195 F. Supp.3d, at 759. *Third*, and finally, although several years passed between Domus providing Asset Management Services and the *47 East* Action, 47 East was engaged in litigation throughout that time. I therefore find that Domus's provision of Asset Management Services was substantial and thus a proximate cause of the Loss.

Arch tries to avoid this outcome by invoking the "efficient proximate cause" doctrine. There are two problems with that argument. *First*, it's not clear that the doctrine applies as a matter of law. The doctrine stems from a decision of the Pennsylvania Supreme Court in 1927. *See Trexler Lumber Co. v. Allemannia Fire Ins. Co. of Pittsburgh*, 136 A. 856, 858 (Pa. 1927). But much more recently, in 2016, the Pennsylvania Supreme Court explained, "[t]his Court has never insisted that a plaintiff must exclude every other possible cause for his or her injury, and in fact, we have consistently held that multiple substantial causes may combine and cooperate to produce the resulting harm to the plaintiff." *Rost* 151 A.3d at 1051.

*Second*, even if the doctrine could apply in this case, it doesn't bar coverage. This is not a situation where multiple external events combined to cause a loss. The existence of a contract was a but-for cause of the *47 East* Action against Domus. So were Domus's business dealings with BWW and 47 East. The *47 East* Complaint includes claims based on both. There is no need to determine which cause is the most substantial so long as an excepted act was **a** substantial cause of at least one of the claims in the *47 East* Action, which invoked the exception and therefore triggered Arch's obligations under the Arch Policy.[1]

---

[1] Because I conclude that Domus's asset management services were a substantial cause of the *47 East* Action, it doesn't matter whether Domus's loan activities also constitute a substantial cause of the harm because the Policy applies either way. But if I had to resolve the issue, I would likely conclude that the lending activities were not a

### b.    Arch's response

With Domus having carried its burden to show that providing Asset Management Services was a substantial cause of its Loss, the burden shifts to Arch to demonstrate that the Loss would have occurred even if Domus not engaged in this covered activity. Arch hasn't made such a showing. It instead argues that 47 East still would have sued for BridgeStreet's breach of the guaranty. But breach of contract wasn't the core of the claims against Domus; 47 East brought claims for tortious interference, abusing the corporate form, fraudulent conveyance, and negligent misrepresentation. BridgeStreet's breach might have set off the chain of events that led to 47 East asserting these claims. But Arch offers no evidence to suggest that Domus would have faced those claims, or incurred those costs, without providing those services.

### 2.    Other cases

Courts applying Pennsylvania law have held that an insurer has a duty to cover an insured's expenses in an action otherwise outside the scope of coverage if that action is sufficiently related to the underlying action. *See, e.g.*, *Safeguard Scientifics, Inc. v. Liberty*

---

substantial cause. 47 East could not have brought its claims if Domus had not purchased its debt and then foreclosed on its collateral, so a "contract to purchase, invest in, or lend money to a Portfolio Company or potential Portfolio Company" was a but-for cause of Domus's subsequent Loss. But it was too attenuated to constitute a substantial cause. It did not form the basis of any of the claims in the *47 East* Action but was just a step along the way. Extending a loan to an overleveraged company, without more, is "a situation harmless unless acted upon by other forces ... ." *Heeter*, 195 F. Supp.3d at 759.

*Mut. Ins. Co.*, 766 F. Supp. 324, 334 (E.D. Pa. 1991). However, the Third Circuit has since

adopted the bright-line rule that:

> an insurer has a duty to cover an insured's expenses for prosecuting
> counterclaims in the initial proceeding, but that insurer has no duty to
> cover the expenses incurred by an insured in prosecuting an entirely new
> and separate action (even if that action is related to the underlying case.)

*Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 522 (3d Cir. 2012).

Domus initiated bankruptcy proceedings as a strategic measure to ensure it could

continue to litigate the *47 East Action*. The two proceedings were separate from one

another, even if, as Domus insists, Arch's refusal to advance defense costs left it with no

choice but to declare bankruptcy if it wanted to continue to defend in the *47 East*

Action. Because Domus's bankruptcy proceedings were a new and separate action, Arch

has no duty to cover the costs from that action.

Arch also moves for summary judgment on whether Domus can recover fees that

it and other "Non-Debtor Insureds" have incurred, including for the present coverage

action against Arch. Domus disclaimed any effort to do so. (*See* ECF No. 115 at 19.) That

argument is therefore moot.

### 3.    Claims against QBE

Given that the *47 East* Action concluded and Domus's legal fees from Domus's

bankruptcy proceedings is outside the scope of the Arch Policy's coverage obligations, I

can conclude that Domus's Loss will not exceed Arch's $5.5 million coverage limit (*i.e.*,

the retention plus the Arch Policy's limit) and enter QBE's layer of excess coverage. I will therefore grant summary judgment to QBE.

**B.    Bad Faith Claims**

Domus asserts claims of both statutory and contractual bad faith, but neither claim can proceed.

**1.    Statutory bad faith**

Pennsylvania law imposes a two-year statute of limitations for statutory bad faith claims. *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 885 (Pa. 2007); *see* 42 Pa.C.S.A. § 8371. A claim under this statute begins to run as of "the date on which the defendant insurance company first denie[s] the insured's claim in bad faith." *Rottmund v. Cont'l Assur. Co.*, 813 F. Supp. 1104, 1106 (E.D. Pa. 1992). Continuing denials of coverage after that point do not give rise to separate acts of bad faith. *See Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1040 (Pa. Super. 1999); *see also Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005). Instead, those allegations relate back to the initial denial and do not provide the basis for a separate claim. *See CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co.*, 645 F. Supp. 2d 354, 366 (E.D. Pa. 2009). To extend the appropriate date for calculating the statute of limitations, a plaintiff must allege actionable instances of bad faith distinct from and unrelated to an insurer's initial denial of coverage. *See id.* at 375.

Arch denied coverage based on the Contract Exclusion on December 30, 2019. At that point, Domus's bad faith claim began to accrue. Domus did not assert its statutory

bad faith claim until September 27, 2022, nearly three years after Arch issued its letter

denying coverage. Therefore, the statute of limitations bars the claim.

    None of Domus's arguments avoids this outcome. *First*, Arch's subsequent

coverage letters do not constitute separate acts of bad faith because they did not

constitute new coverage positions. Instead, they consistently invoked the Contract

Exclusion at issue in this case. The fact that Arch might also have articulated other,

additional coverage positions, or that it also addressed coverage for individual

defendants, does not change that fact.

    *Second*, there is no basis to estop Arch from asserting the statute of limitations

based on its conduct in this case. I have already dealt with Arch's conduct in a decision

imposing sanctions. And, in any event, nothing about Arch's conduct in this case

impacts the statute of limitations analysis. Arch articulated a coverage position in 2019.

Domus knew the basis to challenge that position based on the language in the Arch

Policy and the facts of the *47 East* Action. Domus didn't need to know about the

BatesCarey letter, or about Arch's decision not to accept BatesCarey's advice about

coverage, to be on notice of and to assert the claim. Arch's litigation conduct therefore

provides no basis to toll the statute of limitations or to estop Arch from asserting it.

    Finally, I note that none of the supplemental discovery that I authorized Domus

to take would change this outcome. To reset the statute of limitations, Domus would

have to show that Arch took a different coverage position with it. Discovery about Arch's

internal discussions would not shed light on that issue; Domus would already know if Arch had done that. Instead, the supplemental discovery would only help Domus build its case about Arch's own conduct and whether it comported with its statutory duties. That would only be relevant if the claim were timely. I therefore do not need to wait for that discovery to decide this issue.

### 2.    Contractual bad faith

"Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim." *Simmons v. Nationwide Mut. Fire. Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011) (citations omitted). The duty of good faith and fair dealing is an implicit guarantee of an insurance contract, so an action for breach of this duty is an action for breach of contract. *See Ash*, 932 A.2d at 884. Therefore, when a plaintiff brings a claim against a defendant for breach of contract, any separate claim for breach of the implied duty of good faith merges into the contract claim.

Domus's Complaint alleges both breach of contract and common law bad faith. It argues that the bad faith claims are for both Arch's denial of Domus's claim for defense costs and its intentional misdeeds in adjusting that claim. However, I don't see a distinction between the two, nor has Domus pointed me to one. Arch had contractual duties to Domus Those duties included both investigating the claim in good faith and paying any covered claims. To the extent Arch violated the Arch Policy by the way that it

handled the claim, that is a species of breach of contract, and Domus's breach of contract claim encompasses it.

## IV.    CONCLUSION

The Arch Policy required Arch to advance the defense costs that Domus incurred in the *47 East* Action, but only those costs. It does not require payment of costs to prosecute other cases, such as Arch's proceedings. Therefore, Domus is entitled to $3,371,149.12 in damages from Arch (the amount of defense costs that it incurred in the *47 East* Action less the $500,000 retention). Domus's bad faith claims against Arch fail because the statutory claim is untimely and the common law claim is really just another way of asserting a breach of contract. I will grant summary judgment to Domus on its claims against Arch for the costs incurred in the *47 East* Action and grant summary judgment to the insurers on Domus's remaining claims. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*

**JOSHUA D. WOLSON, J.**

September 10, 2024